## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CATHLEEN ANSLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE** |
| **v.** | : | **NO. 1:06-CV-1030-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.**[1] | : | |

## OPINION AND ORDER[2]

Plaintiff Cathleen Ansley ("Plaintiff") brought this action pursuant to § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income

---

[1]    On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social Security. Under the Federal Rules of Civil Procedure, Astrue "is automatically substituted as a party." FED. R. CIV. P. 25(d)(1).

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [Doc. 12]. Therefore, this Order constitutes a final Order of the Court.

AO 72A
(Rev.8/8
2)

("SSI") benefits  under the Social Security Act ("the Act").[3]  For the reasons stated

below, the undersigned **REVERSES AND REMANDS** the Commissioner's denial of

benefits.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI on June 25, 2001, alleging disability

commencing on January 1, 1992.  [Record (hereinafter "R") R47-50].  Plaintiff's

application was denied initially and on reconsideration.  [*See* R29-31, 36-38].  Plaintiff

then requested a hearing before an Administrative Law Judge ("ALJ").  [R39-40].  An

evidentiary hearing was held on February 11, 2004.  [R353-73].  The ALJ issued a

decision on August 23, 2004, denying Plaintiff's claims on the grounds that claimant's

---

[3]      Title II of the Social Security Act provides for federal disability insurance
benefits ("DIB").  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act,
42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the
disabled.  Title XVI claims are not tied to the attainment of a particular period of
insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).
The relevant law and regulations governing the determination of disability under a
claim for SSI benefits are nearly identical to those governing the determination under
a claim for DIB.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Under
42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully
applicable to claims for SSI benefits.  In general, the legal standards to be applied are
the same regardless of whether a claimant seeks DIB, to establish a "period of
disability," or to recover SSI benefits.  However, different statutes and regulations
apply to each type of claim.  Therefore, to the extent that the Court cites to DIB cases,
statutes, or regulations, they are equally applicable to Plaintiff's SSI claims.

2

medically determinable impairments did not prevent her from performing her past relevant work. [R10-20]. Plaintiff then sought review by the Appeals Council and on February 9, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. [R4-9].

Plaintiff then filed an action in this Court on April 11, 2006, seeking review of the Commissioner's decision. *Cathleen Ansley v. Joanne B. Barnhart,* Civil Action File No. 1:06-CV-01030. [Doc. 2]. The answer and transcript were filed on November 15, 2006. [Docs. 6-7]. The matter is now before the Court upon the administrative record, the parties' pleadings, briefs and oral argument, and is ripe for review pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STATEMENT OF FACTS

### A.   *Medical Records*

Plaintiff, weighing 161 pounds, was seen at a Grady Health System ("Grady") facility on April 5, 2000, where she complained of pain in her side every two to three days and a history of hypertension and psychological disorders. She indicated that she had been off crack cocaine for 11 days. Plaintiff had a suprapubic mass and she given the numbers for the mental health clinic and substance abuse programs. She was told to follow up in one month for a physical exam. [R216]. On April 19, Plaintiff was

3

diagnosed with uncontrolled hypertension and edema (the physical sign commonly likened to swelling or increased girth that often accompanies the accumulation of fluid in a body part).[4]  She was told to have her blood pressure checked in one week and given blood pressure medication.  She weighed 174 pounds.  [R215].  On April 20 and 27 and May 4, Plaintiff had her blood pressure checked.  [R212-14].

On May 17, 2000, Plaintiff, weighing 180 pounds, complained of swelling, poor sleep, visual and auditory hallucinations, and bad nerves at a Grady clinic. An examination revealed two masses in Plaintiff's right breast[5] and a pelvic mass. Plaintiff was diagnosed with a fibroid uterus and hypertension, and sought a mammogram.  Plaintiff was prescribed nifedipine (a hypertension drug).  [R211]. On June 1, 2000, Plaintiff complained of both legs swelling.  She was prescribed HCTZ (a diuretic and a drug used to treat blood pressure) and clonidine (a blood pressure drug).  [R210].  On June 19, 2000, Plaintiff went to Grady for a hypertension check up at which she indicated having poor sleep, multiple stressors, and improvement with her

_____

4       Except where otherwise noted, the Court used the website mediLexicon to define medical terms, decipher medical abbreviations, and determine for what purpose certain pharmaceutical drugs were prescribed.  *See* mediLexicon, http://www.pharma- lexicon.com/ (last visited Apr. 6, 2007).

5       Subsequent mammograms determined that the mass was stable within the left breast consistent with a fibroadenoma (a benign tumor).  [*See* R217/294, 233, 238].

4

leg edema except when she was standing.  She weighed 180 pounds.  The doctor gave the following assessment: (1) her hypertension was excellent; (2) she was still clean; and (3) she had an infection following an abnormal pap smear.  Besides HCTZ and clonidine, Plaintiff was prescribed Paxil (an antidepressant) for her stressors and doxycycline (antibiotic) for her infection.  [R209].

Plaintiff completed an initial assessment on June 22, 2000, at the Department of Mental Health, Mental Retardation, and Substance Abuse ("Mental Health Department") indicating that her nerves were "real bad," she heard things, she slept two or three hours per night, and she had been free of crack (cocaine) for 90 days.  [R288]. Plaintiff returned to the Mental Health Department on July 14 where Dr. Owens diagnosed her as follows: (1) depressive disorder, NOS on Axis I;[6] (2) cluster B personality disorder[7] on Axis II; (3) hypertension and breast mass on Axis III; (4) financial problems on Axis IV; and (5) a Global Assessment of Functioning

_____

[6]    Depressive disorder nos is a depressive disorder category that does not meet the criteria for other depressive disorder categories.  DSM IV at 381.

[7]    The DSM-IV identifies 10 specific personality disorders that are grouped into three clusters.  Those personality disorders in Cluster B include antisocial, borderline, histrionic, and narcissistic personality disorders.  Individuals with these disorders often appear dramatic, emotional, or erratic.  DSM IV at 685.

("GAF") score of 50[8] on Axis V.  The plan for Plaintiff indicated that she needed a lot of work, she needed relapse prevention work, and she needed coping skills work. [R287A].  A mental status examination by a social worker revealed that Plaintiff: (1) was cooperative; (2) had normal psychomotor activity; (3) behaved appropriately; (4) was alert and oriented; (5) had intact memory; (6) had normal speech; (7) was within normal limits for affect and mood; (8) had logical thought processes; (9) admitted to paranoid feelings and audiovisual hallucinations; (10) had fair judgment, insight, and impulse control; and (11) slept two to three hours per night. [R284-86].

---

[8]    The GAF rates an individual's overall psychological, social, and occupational functioning. *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing DSM-IV at 32).  The GAF ranges:

> from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning. . . . Each range can be described as follows: . . .; a GAF score of in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);" . . . .

*Id.* (internal citations omitted) (citing DSM-IV at 32, 34).

6

Plaintiff returned to Grady on July 19, 2000, where she was told to resume her medications for hypertension and take Paxil for depression. [R208]. On August 14, 2000, Plaintiff complained that her back went out, preventing her from bending and lifting. Plaintiff was given an excuse from work until August 18 and diagnosed with an acute muscle strain that required rest. [R207]. On August 21, Plaintiff was told to take her medications consistently for hypertension by her Grady doctor. Plaintiff indicated that her back pain was better. [R206]. Plaintiff returned to Grady on September 13 complaining of headaches and heart fluttering since starting new blood pressure medication. She also reported going to the chiropractor for her back. The doctor decreased her Felodipine (hypertension drug) and started her on atenolol (blood pressure drug). [R205].

Plaintiff weighing 204 pounds returned to Grady on October 11, 2000, complaining of sweating in lower extremities, pedal edema, shortness of breath, a smothering sensation, depressed mood, and stress. Plaintiff was diagnosed with edema and shortness of breath, and she was prescribed Lasix (a diuretic). [R204]. On October 26, Plaintiff informed a Grady doctor that her swelling had improved much. [R203].

7

AO 72A
(Rev.8/8
2)

On October 24, 2000, Plaintiff presented to Barney Ross, a behavioral health counselor at the Department of Health, as sad and hyperverbal.  A stressor in her life was her fear that she would return to jail for parole violations.  Plaintiff was encouraged to maintain self control and composure and not blame others so much.  [R275].  In an October 24 session with Dr. Herrera, her psychiatrist, Plaintiff had a mild constriction of her affect and her mood was sad and upset, but she appeared clean and properly dressed.  She reported sleeping well, and she was job hunting due to pressure from her parole officer.  Dr. Herrera found that Plaintiff was fragile and had limited compliance with her medications.  [R274].

Ross indicated on November 7, 2000, that Plaintiff's mental status was unchanged from last time, and she presented as depressed and angry.  [R273].  On November 29, Ross indicated that Plaintiff was mildly depressed.  Plaintiff complained about her relationship with her parole officer and her son's alleged drug dealing.  [R272].  Dr. Herrera indicated that Plaintiff exhibited a wide range of affect and showed sadness at times.  Plaintiff reported that she was sleeping well with medications.  Plaintiff was clean, properly clothed, calm, cooperative, coherent, and pleasant.  Plaintiff was stable on her medications and given the same diagnosis.  [R271].

8

Plaintiff presented at Grady on December 12, 2000, with chest tightness when walking and going up stairs along with leg swelling.  Plaintiff was determined to have gastro reflux disease, hypertension, and fatigue.   The doctor prescribed atenolol (hypertension drug) and Zantac (drug for gastro reflux disease). [R220].  On December 18, 2000, Plaintiff complained of bilateral feet swelling, fatigue, heart palpitations, and depressed mood.   A Grady doctor found that Plaintiff had fatigue, a history of depression, causing the doctor to increase the Paxil dosage, bilateral pedal edema, leading the doctor to increase her Lasix dosage, and inadequate control of hypertension, leading the doctor to continue clonidien, add lisinopril, and discontinue atenolol. [R201].

On January 2, 2001, Plaintiff reported to Dr. Herrera that she was sleeping well and was improving interactions.  Plaintiff appeared clean, calm, properly clothed, and cooperative.  Her impulse control was good.  She was stable but afraid of her decreased heart rate and increased feet swelling.  Plaintiff's Elavil was tapered.  [R270].

Plaintiff, weighing 214 pounds, returned to Grady on January 9, 2001, complaining of stomach pain, and she was diagnosed with hypertension.  [R200]. On January 26, 2001, Plaintiff went to Grady, reporting that her stress increased due to her son's abusiveness to his girlfriend.  Plaintiff was found to be depressed and

9

possibly to be suffering from post traumatic stress disorder, but her hypertension was excellent.  [R199].

On February 7, Plaintiff reported to Ross that she was functioning fairly well. He discussed her dilemma about not reporting to her parole officer and explored developing coping strategies.  [R269].  Plaintiff's mood was concerned and sad before Dr. Herrera.  Plaintiff was clean, cooperative, properly clothed, coherent, and anxious. Discussions with Dr. Herrera brought Plaintiff tranquility.  Plaintiff resumed her Elavil. [R268].

Plaintiff reported to Ross on March 9, 2001, that her life was going fairly well except that she could not find a job and was experiencing mild depression as a result. Ross indicated that Plaintiff was showing consistency meeting her doctor's appointments and was still attending her drug treatment program.  [R267].  On March 16, Dr. Herrera found Plaintiff's affect was insecure and afraid of failure.  Plaintiff's mood swung.   Plaintiff reported insomnia.   She was clean, neatly dressed and cooperative, but she demonstrated verbal hostility.  Plaintiff had mild symptoms after noncompliance with her drugs.  [R266].

Plaintiff, weighing 224 pounds, returned to Grady on March 27, 2001, complaining of nausea, edema to her lower extremities, a productive cough, pain in her

10

legs, and persistent shortness of breath.  She was found to have hypertension, shortness of breath upon exertion, and pedal edema.  [R195].  Plaintiff was seen at Grady on March 30 for hypertension management, and she complained of headaches.  Her edema resolved.  Plaintiff was diagnosed with allergic rhinitis symptoms (inflamation of the nasal mucous membrane manifest by sneezing and nasal congestion), stress, hypertension, leading to an increase in "ACEI," and weight gain. [R194].  On April 16, 2001, a Grady doctor diagnosed Plaintiff with bronchitis and noted that she had a calm demeanor.  [R193].  Plaintiff returned to Grady the following day complaining of shortness of breath from exertion.  Plaintiff was diagnosed with bronchitis.  [R192].

Plaintiff demonstrated a wide range of affect during her April 18, 2001, appointment with Dr. Herrera.  Plaintiff reported sleeping well, feeling irritable, and breaking up with her boyfriend.  She appeared clean, calm, cooperative, and neatly dressed, and she had good impulse control.  Plaintiff was grieving due to her separation with her boyfriend.  [R265].  On this same day, Ross indicated that Plaintiff was transitioning from her breakup, but Plaintiff seemed to be functioning fairly well. [R264].

Plaintiff appeared clean, properly clothed and cooperative for her May 18, 2001, appointment with Dr. Herrera.  Her mood was anxious at times, but she was stable on

11

her medications.  [R263].  Ross indicated that Plaintiff had shown some improvement despite family issues and she was still attending her group meetings.  [R262].

Plaintiff returned to Grady on May 25 for her hypertension management where she complained of increased stress because of people and sedation from claridine (a hypertension drug).  Plaintiff was tearful at the visit, and her medications were changed for hypertension.  [R189].

On June 1, 2001, Plaintiff was seen at Grady for blood pressure.  The doctor increased the dosage of her blood pressure medication, Felod.  [R187].  Plaintiff returned on June 14 because of her blood pressure and was prescribed Lisinoprin (a drug used to treat high blood pressure).  [R186].

On June 19, 2001, Plaintiff appeared clean and neatly dressed and groomed. Plaintiff requested something to relax her due to irritation and nightmares.  She had visual hallucinations and was anxious.  Her dosage for a medication was increased. [R261].

Plaintiff went to Grady because of nasal congestion on July 9, 2001.  She was diagnosed with allergy exacerbation.  [R185].  On July 13, 2001, Plaintiff underwent a total abdominal hysterectomy, bilateral salpingo-oophorectomy (removal of the ovary and its uterine tube), and lysis of adhesion (destruction of adhesions from tissues) after

12

having been seen at the Grady clinic several times with very painful menstrual cycle pain.[9]  [R102, 104].  At the time of her discharge on July 16, Plaintiff had the following diagnoses: symptomatic leiomyomatous uterus (an irregularly shaped or enlarged uterus)[10]; hypertension; gastroesophageal reflux disease; bipolar disorder; bronchitis; history of trichomonas, treated; history of breast mass, benign.  [R102].

Plaintiff was seen at a Grady facility on July 27, 2001.  She reported less vaginal bleeding, but complained of gas, increased burping, and constipation.  She was diagnosed with anemia and GERD (gastroesphageal reflux disease) symptoms.  She was given Zantac (medication to treat heartburn and indigestion).  [R184].

On July 29, 2001, Plaintiff was admitted to Grady due to vaginal bleeding that started on July 24.  [R110].  Plaintiff was diagnosed with "probably a resolving hematoma" (a localized mass of blood that is relatively or completely confined within a space) and discharged on July 30.  [R112].  A July 30 CT contrast revealed large complex fluid collection within the pelvis and left inferior rectus muscle, which likely represented an abscess or hematoma.  [R230-31].

---

[9]    A June 18, 2001, vaginal ultrasound had revealed an enlarged uterus. [R235].

[10]    *See* Medline Plus Medical Encyclopedia, Uterine Fibroid article, http://www.nlm.nih.gov/medlineplus/encyclopedia.html (last visited April 13, 2007).

13

On August 20, 2001, Dr. Herrera found Plaintiff's affect to be appropriate and her mood to be sad and anxious.  Plaintiff reported irritability, sadness, and crying spells.  She was clean, properly clothed, and cooperative.  Plaintiff did not have hallucinations.  Plaintiff was instructed to resume her medication "ASAP."  [R260].  Ross indicated on this day that Plaintiff was depressed due to her family life.  He indicated that her overall mental status had improved, but that she refused to follow up regarding specific stressors.  [R259].[11]

Dr. H. Thomas Unger performed a psychiatric review technique of Plaintiff on October 22, 2001, noting that Plaintiff had affective, personality, and substance addiction disorders, but determined that there was insufficient evidence to substantiate the presence of the disorders.  [R114, 117, 121-22].

Plaintiff went to Grady for hypertension on October 26, 2001.  She reported that she was taking medication, she had a new job as a cashier, and her gastroesophageal reflux was controlled by Zantac.  She was diagnosed with anemia and allergy rhinitis, and the doctor indicated that her hypertension should be watched.  Plaintiff was instructed to return to the clinic in three to four months.  [R183].

---

[11]   Plaintiff's mental health records are illegible for the period between November 11, 2001, and January 22, 2002.  [R252-58].

14

Plaintiff returned to Grady on November 27 where she was diagnosed with asthma exacerbation and "pneumonia vs bronchitis."  She was encouraged to quit smoking and instructed to return on December 3.  [R182].  Plaintiff returned to Grady on December 3 when she had wheezing, and her doctor stressed the importance of quitting smoking.  [R181].

Dr. R. Bruce Prince performed a psychiatric evaluation on December 10, 2001.  He noted that Plaintiff arrived alone by bus.  [R129].  She was appropriately dressed and attired.  [R132].  Plaintiff reported a history of panic attacks, having a feeling that someone was in the room, hearing voices, and seeing scary spots.  [R129].  Plaintiff stated that she was often shaky, tense, angry, and unable to cope.  She felt depressed and cried and felt overwhelmed every several days.  Her sleep was pretty good with medication.  She had low energy, a stable weight, and a volatile temper.  Plaintiff's feelings were easily hurt, and she had difficulty concentrating and comprehending, especially if multiple events occurred simultaneously.  Plaintiff was addicted to crack cocaine for 10 or 11 years, but she had been clean since March 2000.  [R130].

Plaintiff lived by herself.  She attended Narcotics Anonymous ("NA") meetings several times a week and had been looking for a job since October 2001.  Plaintiff lied down a lot.  She cared for her hygiene.  She used the bus to get around, and would

15

occasionally visit her sister and help her older daughter with Plaintiff's grandchild. Plaintiff did not have friends and did not attend church. Plaintiff had conflicts with her children and grandchildren because they thought she was "putting on." Plaintiff saw her siblings daily, but was not close with them. She also saw her mother daily. Plaintiff did not have a GED. [R131].

Dr. Price indicated that Plaintiff had a number of physical problems. Plaintiff was taking a hypertension drug, furomiximide, estrogen, trazodone (an antidepressant) at bed time, felodipine, and Fexafenedine (an antihistamine). [R132]. She was also taking Paxil and hydroxyzine (a short-term anti-anxiety drug). [Doc. 10 at Attach.]. Plaintiff had difficulty providing her history spontaneously but responded to questions. Her mood was a mixture of fear and sadness, but her associations were logical and coherent. Her stream of thought was mildly slowed. Plaintiff was oriented to time, person, place, and event. Her insight was significant, and her judgment was influenced by her psychiatric condition. [R132].

16

AO 72A
(Rev.8/8
2)

Dr. Price provided the following diagnosis: (1) schizoaffective disorder,[12] depressed, chronic, panic disorder without agoraphobia, and cocaine dependence in remission since March 2000 on Axis I; (2) borderline personality disorder, chronic on Axis II;[13] (3) hypertension on Axis III; (4) moderate chronic psychological and substance abuse problems on Axis IV; and (5) a GAF score of 50 on Axis V. [R132; Doc. 10 at Attach.]. Dr. Price noted that Plaintiff's condition was chronic and would require ongoing care. He had a guarded prognosis for her. Plaintiff's appearance was questionable in terms of a regular work setting because she was intermittently teary and had a fearful and depressed mood. Dr. Price indicated that Plaintiff could understand and retain simple one or two step instructions, but she would have "grave difficulty" carrying these out to completion in a dependable manner. Dr. Price noted that Plaintiff would have difficulty with supervision because she was sensitive and had a poorly

----

[12]      Schizoaffective disorder is an uninterrupted period of illness during which, there is a major depressive, manic, or mixed episode concurrent with some of the following symptoms: delusions, hallucinations, disorganized speech, grossly disorganized behavior, restriction in the range of emotional expression, restriction in the fluency of thought and speech, and restriction in goal-directed behavior. Also, the delusions must last for at least two weeks. Finally, the mood symptoms must be present for the duration of the illness. DSM IV at 319.

[13]      Borderline personality disorder is characterized by marked impulsivity beginning in early adulthood and a pervasive pattern of instability in interpersonal relationships, self-image, and affects. DSM-IV at 706.

AO 72A
(Rev.8/8
2)

controlled temper.  Dr. Price believed that Plaintiff would have significant conflicts with fellow workers.  [Doc. 10 at Attach.].

On January 2, 2002, Plaintiff went to Grady for her asthma and complaints of chest tightness.  Plaintiff had audible wheezing.  She was diagnosed with asthma exacerbation and prescribed azmacort MDI (an inhalation aerosol used to treat asthma symptoms) and prednisone (a steroid that decreases the immune system's response to allergens and treats breathing problems).  [R180].  Plaintiff returned to Grady on January 4 because of a hoarse voice and coughing at night.  She weighed 227 pounds.  She was diagnosed with asthma exacerbation and hypertension, and her medication was increased.  [R179].  Plaintiff followed up for her asthma at Grady on January 11 where she indicated that she was depressed.  She had a pleasant demeanor.  Her diagnosis was asthma exacerbation resolving and depression.  [R178].

Dr. Unger performed another psychiatric review technique on January 14, 2002, finding that Plaintiff had schizophrenic, paranoid and other psychotic disorders, an anxiety-related disorder, a personality disorder, and a substance addiction disorder in remission since March 2000.  [R133, 141].  Plaintiff's personality disorder was characterized by inflexible and maladaptive personality traits, persistent disturbances of mood, intense and unstable interpersonal relationships and impulsive and damaging

18

behavior.  [R140].  Dr. Unger found that Plaintiff had mild restrictions of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, or pace.  [R143].

For a mental residual functional capacity assessment, Dr. Unger indicated that Plaintiff was not significantly limited in the ability to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or seek assistance; maintain socially appropriate behavior and adhere to standards of neatness; be aware of normal hazards and take precautions; and use public transportation.  Plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities with a schedule; maintain regular attendance; work in coordination with or proximity to others; complete a normal workday and workweek without interruptions from psychological symptoms; accept instructions and respond appropriately to criticism; and get along with coworkers or peers.  [R147-48].

Dr. John Hollender, Ph.D., completed a psychiatric review technique, finding that Plaintiff had: (1) depressive disorder characterized by decreased energy, difficulty

concentrating, hallucinations, and depressive panic, [R155]; (2) personality disorder characterized by pathological dependence, passivity, or aggressivity and intense and unstable interpersonal relationships, [R159]; and (3) substance addiction disorders, [R160].  Dr. Hollender indicated that Plaintiff had mild restrictions of daily living activities, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace.  [R162].  In a mental RFC assessment, Dr. Hollender indicated that Plaintiff was moderately limited in her ability to: carry out detailed instructions, maintain concentration for extended periods; complete a workweek without interruption; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior.  [R166-67].  Otherwise, Dr. Hollender found no significant limitations in Plaintiff's ability to: set realistic goals or make plans independently of others; use public transportation; be aware of normal hazards and take precautions; get along with coworkers or peers without distracting them; ask simple questions or request assistance; make simple work-related decisions; work in coordination with or in proximity to others; sustain an ordinary routine without special supervision; perform activities within a schedule; maintain regular attendance; be punctual; remember locations and work-like procedures; understand, remember, and carry out simple instructions; and

20

understand and remember detailed instructions.  [*Id.*].  In making this assessment, Dr. Hollender gave Dr. Prince's report much weight.  [R168].

On February 11, 2002, Plaintiff went to Grady where she complained of wheezing, abdominal pain every three nights, and a shifting mood.  Plaintiff was diagnosed with abdominal pain and told to avoid nonsteroidal anti-inflammatory drugs. Plaintiff's hypertension was elevated.  [R176].

Dr. Herrera saw Plaintiff on February 22, 2002.  Plaintiff indicated that she was not sleeping well, afraid of getting a job, and overwhelmed about her frustrations and difficulties.  Plaintiff was clean, cooperative and properly attired, but she also experienced audiovisual hallucinations.  Dr. Herrera diagnosed Plaintiff with anxiety disorder, N.O.S, and started Plaintiff on a new medication.  [R251].

Dr. Herrera saw Plaintiff on March 11, 2002, and indicated that Plaintiff was clean, cooperative, and properly dressed.  Plaintiff complained of difficulty sleeping, which was aggravated by pain in her back.  Dr. Herrera continued Plaintiff on the same medications but decreased the dosage of one.  She had good impulse control.  [R250].

21

Plaintiff had a barium swallow on March 13, 2002, which revealed evidence of reflux, a small hiatal hernia,[14] and normal stomach and duodenum.  [R220].  Plaintiff had a bone density study on March 18, 2002, which revealed nomral mineral density in the spine bone and borderline low mineral density in the hip bone.  [R221].

Plaintiff went to the Grady asthma/allergy clinic on April 5, 2002 where she was doing okay with breathing but complaining of a bad headache and feeling very tired. The doctor determined that Plaintiff's asthma was stable and her sinusitis was clearing. Plaintiff was also determined to have hypertension and gastroesophageal reflux disorder.  She was told to continue with her current regime.  [R175].

Dr. Herrera noted on May 6, 2002, that Plaintiff had not complied with her medication in two weeks.  Plaintiff weighed 236 pounds.  Plaintiff's mood was "down and out," and Plaintiff reported wanting to do nothing.  Plaintiff had difficulty sleeping, and she was disappointed about her unsuccessful job search.  Although Plaintiff was clean, cooperative, and neatly dressed and groomed, she was verbally hostile at times. Dr. Herrera increased Plaintiff's Paxil and another medication.  [R249].

--------

[14]     A hiatal hernia is a "a condition in which a portion of the stomach protrudes upward into the chest, through an opening in the diaphragm."  This hernia itself rarely causes symptoms.  Instead the pain and discomfort are usually caused by reflux of gastric acid.  Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/ medlineplus/ency/article/001137.htm (last visited Apr. 6, 2007).

22

Plaintiff returned to the allergy clinic on May 16 where she indicated that she was doing okay with breathing but complained of nasal congestion, headache, cough, and post nasal drip when outside in pollen. The doctor determined that Plaintiff's asthma was stable, she had allergic rhinitis, gastroesophageal reflux disorder, hypertension, and depression. Also, the doctor had Plaintiff continue her current regime and add FloNase (a corticosteroid that works with nasal passages to reduce inflammation and swelling). [R173].

Plaintiff reported to Dr. Herrera on June 3 that she was sad because her sister had died the previous week. Dr. Herrera indicated that Plaintiff was clean, cooperative, and properly dressed. Plaintiff reported dying thoughts. Dr. Herrera found Plaintiff was grieving and continued Plaintiff on the same medications. Plaintiff had good impulse control. [R248].

Plaintiff went to the Grady allergy clinic on June 20, 2002, where she stated that she was doing okay with her breathing but complained of phlegm in her throat. She admitted to poor compliance with her medication due to the death of her sister. Plaintiff was assessed with persistent asthma, allergic rhinitis, gastroesophageal reflux disorder, depression, and hypertension. The doctor encouraged Plaintiff to comply with medications. [R171]. Plaintiff was seen by the Grady allergy clinic complaining of a

23

night cough.  She was diagnosed with a severe persistent cough and told to continue with her current regimen.  [R304].

On July 1, 2002, Plaintiff reported to Dr. Herrera that she was between content and sad.  Plaintiff reported not sleeping well and missing her sister.  Plaintiff was clean, cooperative, and properly dressed.  Dr. Herrera found Plaintiff depressed and grieving for her sister.  Plaintiff's Paxil dosage was increased.  [R247].  Plaintiff reported to Dr. Herrera on August 6, 2002, that she was stressed and so tired from her service work with A.A., but otherwise felt very good.  Plaintiff was sleeping well and had good interactions.  Plaintiff was clean and properly dressed with good impulse control.  Dr. Herrera found Plaintiff stable.  [R246].

Plaintiff reported to Dr. Herrera on September 10, 2002, that she was sleeping well.  Plaintiff's mood was swinging, and she was clean, cooperative, neatly dressed and groomed, and had a good rapport.  Plaintiff demonstrated verbal hostility.  [R245].  Plaintiff returned to see Dr. Herrera on October 8, 2002, and reported sleeping well but breaking up with her boyfriend.  Dr. Herrera noted that Plaintiff was clean, cooperative, and properly dressed, and had good impulse control.  Dr. Herrera found Plaintiff stable but hurt by the breakup with her boyfriend.  [R343].

24

Plaintiff saw Dr. Herrera on November 6, 2002, and reported sleeping well, but also being irritable, tired, and preferring to be by herself. Plaintiff's mood was anxious and sad. Plaintiff had good impulse control, but was directed to start therapy "ASAP." [R342]. Plaintiff reported to Dr. Herrera on December 3 that she was sleeping well. Dr. Herrera found that although Plaintiff was clean, cooperative, and properly dressed, Plaintiff had a sad and anxious mood and was over-stressed and exhibiting psychotic symptoms. Plaintiff reported auditory hallucinations. She had good impulse control. [R341].

On January 6, 2003, Plaintiff reported that she was sad because close people died in the last 10 days. She was sleeping well with medication, but she was having flashbacks, intrusive thoughts, and nightmares. Plaintiff was clean, cooperative, and clothed properly, but she was verbally hostile. Dr. Herrera found that there were moderate to severe stressors. [R340]. Plaintiff returned to Dr. Herrera on February 19, 2003, and presented with an anxious, sad, and fearful mood. She weighed 238 pounds. Plaintiff was sleeping irregularly, and she was not attending her AA meetings because her mind was tired. Dr. Herrera found that Plaintiff was anxious with a death in the family and lack of people to speak with. Dr. Herrera found that Plaintiff was exhibiting Post Traumatic Stress Disorder symptoms. [R339].

AO 72A
(Rev.8/8
2)

Dr. Herrera saw Plaintiff on March 12, 2003.  Plaintiff's mood was anxious, but she slept well.  She reported having varying interactions but preferring to isolate herself.  Plaintiff was clean, cooperative, and properly clothed, and she had good impulse control with periods of hostility.  [R338].  On April 14, Dr. Herrera noted that Plaintiff's mood was "up and down."  Plaintiff was clean, cooperative, and properly clothed.  Plaintiff was sleeping almost 10 hours but she felt tired.  Dr. Herrera found that Plaintiff had stressors and was having side effects from medication.  Plaintiff had good impulse control.  [R337].

Plaintiff was seen at Grady on April 28, 2003, and given the following assessment: edema and well controlled hypertension and asthma.  [R326].

Plaintiff informed Dr. Herrera on May 22 that she was frustrated.  Plaintiff was sleeping well, but she felt tired.  She weighed 244 pounds.  Dr. Herrera determined that Plaintiff had side effects from medication, including tiredness and indicated that Plaintiff would be starting Zoloft in two weeks.  [R336].

A June 2, 2003, pulmonary function report indicated that Plaintiff had asthma. [R320].  A visit to the Grady allergy clinic on June 2 indicated that Plaintiff was doing well.  She was diagnosed with moderate persistent asthma, possible allergic rhinitis, gastroesophageal reflux disorder, depression/anxiety, and hypertension.  [R319].

26

Plaintiff presented with a sad mood on June 26, 2003, to Dr. Herrera because a close friend had died. Plaintiff was sleeping approximately two more hours and was interacting better with others. Plaintiff was feeling less tired. Plaintiff reported hearing voices following her friend's death. She had good impulse control. [R335].

Plaintiff saw Dr. Herrera on July 25, 2003, at which time she had a sad, confused, and frustrated mood. She weighed 250 pounds. Plaintiff reported difficulty sleeping and being afraid of dying and relapsing on drugs following her close friend's death. Dr. Herrera found that Plaintiff was adjusting with anxiety following her friend's death. [R334].

Plaintiff saw Dr. Herrera on August 29, 2003. Plaintiff was anxious, depressed, and fearful, had crying spells, and weighed 262 pounds. Plaintiff reported that three close friends had died in three weeks. Plaintiff indicated that she was feeling paranoid and was waking up every 30 to 60 minutes. Plaintiff also exhibited verbal hostility. Dr. Herrera found that Plaintiff was sad, anxious, and had insomnia. [R333].

On August 29, 2003, Dr. Herrera completed a medical evaluation for affective disorders indicating that Plaintiff's depressive syndrome was characterized by: appetite disturbance with change in weight, sleep disturbance, psychomotor

27

retardation/agitation,[15] feelings of guilt or worthlessness, and difficulty concentrating or thinking.  Plaintiff's depressive syndrome was not characterized by hallucinations, delusions, or paranoid thinking, thoughts of suicide, decreased energy, or anhedonia or loss of interest in activities.  [R307-08].  Plaintiff had no episodes of decompensation or restrictions in daily living but marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  [R309].  Plaintiff's functional limitations were caused by fear, irritability, crying spells, lack of concentration, and thoughts of dying.  Also, Dr. Herrera concluded that Plaintiff's condition was disabling such that it prevented her from engaging in gainful employment due to her distrust, hostility, and lack of concentration.  [R310].

Dr. Herrera also completed a medical assessment of ability to do work related activities form (mental) in which Dr. Herrera indicated that Plaintiff had: (1) good ability to follow rules, complete complex job instructions, complete detailed but not complex instructions; (2) good to poor ability to deal with the public, deal with work stress, and behave in an emotionally stable manner; (3) good to fair ability to use

_____

[15]     Psychomotor agitation is associated with major depressive episodes and involves such behaviors as the inability to sit still, pacing, hand-wringing, and pulling or rubbing skin. DSM-IV at 350.  Psychomotor retardation involves such behaviors as slowed speech, thinking, and body movements; increased pauses before answering; and speech that is decreased in volume, inflection, amount, or variety of content. *Id.*

28

judgment, function independently, interact with supervisors, relate to co-workers; (4) fair to poor ability to maintain attention and concentration and relate predictably in social situations; (5) very good ability to complete simple job instructions and maintain personal appearance; and (6) very good to good ability to demonstrate reliability. [R311-13].

Dr. Mattam saw Plaintiff at the Mental Health Clinic on October 2 and determined that Plaintiff had depressive disorder, n.o.s., with cluster B personality disorder. Plaintiff reported sleeping okay, but she was having interpersonal difficulties. She was well groomed, cooperative, had good impulse control, and weighed 256 pounds. [R332].

Plaintiff returned to Grady on October 14, 2003, for hypertension followup. She indicated that her lower extremity swelling decreased much, but it would increase in the evening a bit. Her hypertension improved. [R321].

Plaintiff complained of depressed mood with hopelessness on October 24. Plaintiff reported auditory hallucinations. Dr. Mattam gave the same diagnosis of depressive disorder and cluster B personality disorder. [R331]. On November 25, 2003, Dr. Mattam indicated that Plaintiff had: major depressive disorder with psychotic features on Axis I; cluster B Personality Disorder on Axis II; hypertension and asthma

29

on Axis III; poor social support and financial problems on Axis IV; and a GAF score of 55 on Axis V.  His plan was for Plaintiff to take Zoloft, continue Risperdal (a drug that treats certain mental/mood disorders and helps individuals to think clearly and function in daily life), Desyrel (antidepressant), discontinue Deparkoti, and go to group therapy.  [R330].

Plaintiff complained of auditory hallucinations with angry outbursts on January 13, 2004.  She was sleeping well, cooperative, and well groomed.  Plaintiff weighed 250 pounds.  She was given the same diagnoses: major depressive disorder with psychotic features.  [R328].

B.    *Evidentiary Hearing Testimony*

At the February 11, 2004, administrative hearing, Plaintiff was 48 years old and had completed eighth grade.  [R358].  Plaintiff reported that she had worked at the following locations since 1999: (1) a snack shop in 1999; and (2) Popeye's restaurant as a prep cook for chicken in June of 2000 where she lifted, separated, and seasoned chicken.  [R359].  Plaintiff left Popeye's because she hurt her back and she had problems multitasking.  [R360].  Plaintiff did not relate well to her supervisor because neither understood the other, and she did not interact with her co-workers.  [R361].

30

Plaintiff reported that she could no longer work because: (1) she got very confused; (2) she would get "real tired"; (3) she did not sleep well; (4) she had anxiety attacks when she was around people; and (5) she could not deal with a lot of stress. [R362]. Plaintiff indicated that the medication she took would help on some days but not others. [R363]. Plaintiff had a back brace and took Motrin for her back pain. [R367].

Plaintiff stated that she attended NA meetings. She had attended two or three times a day until her funds ran low and she could not afford the bus fare. The NA sessions lasted either an hour or an hour and a half. [R364].

Plaintiff testified that she had migraine headaches two times every two weeks. Plaintiff could not sleep well because she heard voices, saw things at night, and her brain felt like it was moving while she was in bed. Plaintiff's asthma caused her to wheeze a lot. Plaintiff was a slow reader and writer. [R365]. Plaintiff regularly saw a doctor for high blood pressure. She had problems adding and subtracting. [R366]. Plaintiff would lie down during the day . [R368].

The vocational expert ("VE") testified that Plaintiff's past relevant work involved light unskilled work as a fast food worker. [R370]. The VE testified that a hypothetical individual with the following characteristics could perform Plaintiff's past

31

relevant work: a fair, meaning limited but satisfactory, ability to understand and carry out detailed instructions; a fair ability to maintain attention and concentration for extended periods; a fair ability to work in coordination with others; and a fair ability to accept instructions or respond appropriately to criticisms.  In addition, the VE stated that a hypothetical person could perform Plaintiff's past relevant work if she had the aforementioned characteristics and a moderate limit on the ability to: interact with the public, complete a normal workday without psychological interruption, and get along with co-workers without distracting them.  [R371].  The VE testified that an individual would not be able to perform Plaintiff's past relevant work or any work within the national economy with the following characteristics: (1) poor ability to maintain concentration and attention and relate predictably in social situations; and (2) a seriously limited ability to deal with the public, to use good judgment, to interact with supervisors, to deal with work stress, to behave in an emotionally stable manner, and to function independently.  [R372].

### III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

32

AO 72A
(Rev.8/8
2)

2.     The claimant's schizoaffective disorder, chronic depression, bronchitis, hypertension, asthma, Cluster B-Personality disorder and panic disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3.     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.     The claimant has the following residual functional capacity: the claimant does not have any exertional limitations but has fair ability to understand, remember and carry out detailed instructions; fai[r] ability to maintain attention and concentration for extended periods; fair ability to work in coordination with others; and fair ability to accept instructions and respond appropriately to criticism from supervisors.

6.     The claimant's past relevant work as fast food worker, snack shop cook and food preparation worker did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 416.965).

7.     The claimant's medically determinable schizoaffective disorder, chronic depression and panic disorder do not prevent her from performing her past relevant work.

8.     The claimant is not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 416.920(e).

[R19-20].

33

The ALJ explained that although Plaintiff worked on and off since 1992, Plaintiff had not engaged in substantial gainful activity.  The ALJ did not give Dr. Herrera's opinion controlling weight because his report of symptoms, social functioning, and concentration, persistence, or pace were not consistent with the medical evidence or with Dr. Herrera's statements regarding Plaintiff's specific work abilities.  [R16].

The ALJ determined that Plaintiff's medical impairments - - schizoaffective disorder, chronic depression, bronchitis, hypertension, asthma, Cluster B-personality disorder and panic disorder - - were severe, but they were not severe enough to meet or medically equal the Listings because they only resulted in mild to moderate limitations to her daily living activities, social functioning, and concentration, persistence or pace.  [R17].  The ALJ determined that Plaintiff's back, headache, and vision impairments were not severe because: (1) she did not receive treatment for her back condition after August 2000; and (2) there was no evidence of treatment for headaches or poor vision.  [*Id.*].

The ALJ concluded that Plaintiff's description of her limitations - - reading problems, learning problems, confusion, fatigue, and anxiety attacks - - were not credible because they were not consistent with other objective evidence.  [R18].  The ALJ determined that Plaintiff had the following residual functional capacity

34

("RFC"): no exertional limitations; fair ability to understand remember and carry out detailed instructions; fair ability to maintain attention and concentration; fair ability to work with others; and fair ability to accept instructions and respond appropriately to supervisor criticism.  [R18-19].  Based on this RFC, the ALJ determined that Plaintiff could perform her past relevant work, namely light, unskilled fast food worker, snack shop cook, and food preparer.  [R19].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities, which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.   42 U.S.C. § 1382c(a)(3)(B), (D).

35

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.  *See* 20 C.F.R. § 416.912(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.  *See* 20 C.F.R. § 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The claimant must prove at step one that she is not undertaking substantial gainful activity.  *See* 20 C.F.R. § 416.920(a)(4)(i).  At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments, which significantly limits his ability to perform basic work-related activities.  *See* 20 C.F.R. § 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience.  *See* 20 C.F.R. § 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work.  *See* 20 C.F.R. § 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age,

36

education and past work experience to determine whether the claimant can perform other work besides past relevant work.   *See* 20 C.F.R. § 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.   *See* 20 C.F.R. § 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).

AO 72A
(Rev.8/8
2)

This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d

38

227, 230 (11th Cir. 1991).   In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff argues that the ALJ erred by: (1) failing to give controlling weight to her treating physician's opinion; and (2) failing to consider all of Plaintiff's impairments in evaluating her residual functional capacity ("RFC").  [Doc. 10].  The Court discusses each claim of error in turn.

### A.     *Treating Psychiatrist's Opinion*

Plaintiff argues that the ALJ's decision not to give the opinion of Dr. Herrera, her treating psychiatrist, controlling weight is erroneous.  [Doc. 10 at 15-18].  Plaintiff first argues that because Dr. Herrera saw Plaintiff 25 times in three years, Dr. Herrera is in the best position to know Plaintiff's mental health limitations.  [*Id.* at 15].  Plaintiff next argues that the other evidence in the record supports Dr. Herrera's opinion including the opinions of Dr. Prince and a physician from South Central Mental Health. [*Id.* at 15-17].  Plaintiff then contends that instead of relying on these opinions, the ALJ impermissibly substituted her own opinions for those of the doctors.  Finally, Plaintiff complains that the ALJ's one sentence analysis that the record does not support

39

Dr. Herrera's opinion is insufficient.  [*Id.* at 17].  As a result of these errors, Plaintiff contends that benefits should be awarded or alternatively that the case be remanded for the ALJ to give proper weight to Dr. Herrera's opinion.  [*Id.* at 17-18].

The Commissioner responds that the ALJ did not give controlling weight to Dr. Herrera's assessments because these opinions were not consistent with the longitudinal view reflected in the treatment notes. [Doc. 14 at 8].  The Commissioner contends that Dr. Herrera's assessment in August 2003 was completed at a time when Plaintiff's symptoms were exacerbated due to deaths of friends and family.  [*Id.* at 9-10]. Otherwise, the Commissioner notes that the medical evidence showed that Plaintiff was doing better, had mild depression, and had good impulse control, mood, and affect. The Commissioner also contends that Dr. Herrera's opinion was inconsistent with state agency psychologists.  [*Id.* at 10].

### 1.    *The Weight Given to the Treating Doctor's Conclusions*

A treating physician's opinion "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'"  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis* , 125 F.3d at 1440); *see also*

20 C.F.R. § 404.927(d)(2); Social Security Ruling ("SSR") 96-2p.[16]  Good cause exists

when the "doctors' opinions were conclusory or inconsistent with their own medical

records," or "the doctor's opinion was not bolstered by the evidence, or where the

evidence supported a contrary finding." *Lewis*, 125 F.3d at 1440.  There is no good

cause when an ALJ credits a consulting physician's opinion over the treating

physician's opinion.  *Id.*; *Bruet v. Barnhart*, 313 F. Supp. 2d 1338, 1346 (M.D. Fla.

2004). Therefore, "a non-examining physician's opinion is entitled to little weight if it

is contrary to the opinion of the claimant's treating physician." *Bell v. Bowen*, 796 F.2d

1350, 1352 (11th Cir. 1986).  However, that a consulting physician's opinion conflicts

with a treating physician's opinion is not a reason for remand when the treating

physician's opinion is conclusory, other medical evidence does not support the opinion,

the opinion conflicts with the treatment notes, or the treating physician is unsure of the

accuracy of the opinion.  *See Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir.

1991).

     The ALJ must clearly articulate the reasons for giving less weight to the treating

physician's opinion, *Lewis*, 125 F.3d at 1440, by "always giv[ing] good reasons in the

---

[16]    Social Security Rulings are binding on all components of the Social
Security Administration.  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6
(N.D. Ga. 2006).

41

notice of the . . . decision for the weight given to a treating source's medical opinion(s)," SSR 96-2p.  Therefore, when the decision is not fully favorable to a claimant, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*  If the ALJ ignores or fails to properly refute the treating physician's opinion, courts in the Eleventh Circuit deem the ALJ's opinion to be true as a matter of law.  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

The Court concludes that the ALJ insufficiently explained why she decided not give great weight to Dr. Herrera's opinion.  After summarizing Dr. Herrera's opinion, the ALJ provided the following analysis concerning the weight given to Dr. Herrera's opinion: "[Dr.] Herrera's report of the claimant's symptoms, social functioning and concentration, persistence and pace are not consistent with the medical evidence of record or with his statements regarding specific abilities to work.  Therefore, the undersigned does not give [Dr.] Herrera's report great weight."   [R16]. The regulations, Social Security Rulings, and case law require more analysis for this Court to review this determination.  The ALJ's one sentence analysis does not clearly

42

indicate that this evidence was used as a basis for rejecting Dr. Herrera's opinion despite SSR 96-2p's requirement that the specific reasons be "supported by the evidence" and "sufficiently specific."

The Commissioner surmises that substantial evidence supports the ALJ's decision because Dr. Herrera's opinion was not consistent with Plaintiff's longitudinal mental health treatment record and was made at a time when Plaintiff's personal life was in upheaval due to numerous deaths of friends and family.  [*See* Doc. 14 at 9-10]. It may be true that the ALJ relied on Plaintiff's personal problems as a reason for not giving Dr. Herrera's opinion controlling weight, but the ALJ's analysis failed to cite to this evidence as a basis for not giving Dr. Herrera's opinion controlling weight nor did the decision otherwise indicate that the ALJ relied on this reason.  The ALJ has provided the Court with two reasons - - conflict with medical record and conflict with Dr. Herrera's other opinions - - without identifying any evidence to support these reasons.  This lack of specificity prevents subsequent reviewers from evaluating whether the ALJ erred in deciding what weight to give the treating physician. *See* SSR 96-2p.  Although this Court could guess as to what evidence the ALJ relied on in discounting Dr. Herrera's opinion, this is inappropriate since the ALJ is required "to make clear . . . the reasons for that weight" given to the treating physician.  SSR 96-

43

2p; *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (noting that the ALJ must "clearly articulate" her reasons for disregarding the treating physician's opinion).

The Court's decision as to the insufficiency of the ALJ's analysis is buttressed by a close examination of the evidence, which shows a complicated picture concerning Dr. Herrera's opinion.  Upon examination, it is unclear whether substantial evidence supports the ALJ's general conclusion that the medical evidence and Dr. Herrera's work findings contradicted Dr. Herrera's opinion.  The ALJ identified three findings of Dr. Herrera that she believed were inconsistent with the evidence: (1) Dr. Herrera's identification of the symptoms; (2) Dr. Herrera's conclusions about Plaintiff's social functioning; and (3) Dr. Herrera's finding regarding concentration, persistence, or pace. The following discussion demonstrates that the ALJ's general conclusion is not entirely supported by the evidence.

a.      *The Symptoms*

Dr. Herrera found that Plaintiff had the following symptoms relating to her depressive disorder: (1) appetite disturbance with change in weight; (2) sleep disturbance; (3) psychomotor agitation retardation; (4) feelings of guilt or worthlessness; and (5) difficulty concentrating or thinking. [R307].  The Court finds that although substantial evidence supports some findings that the medical evidence

44

was inconsistent with the symptoms, evidence supported the existence of other symptoms.

First, evidence supports Dr. Herrera's finding concerning appetite disturbance with change in weight.  In July 2000, Plaintiff weighed 176 pounds when she first went to the Department of Health.  [*See* R208].  Plaintiff's weight increased to 236 pounds in May 2002, [R249], and then to 250 in July 2003 and January 2004, [R328, 334].  Thus, contrary to the ALJ's decision, Dr. Herrera's finding that Plaintiff exhibited symptoms of weight change is supported by substantial evidence.

Second, the Court finds that substantial evidence does not support the ALJ's finding that the medical evidence contradicts Dr. Herrera's finding that Plaintiff had symptoms relating to difficulty in concentrating or thinking.  Dr. Prince determined that Plaintiff had problems with concentration, [R130], and the state consulting doctors also found that Plaintiff's ability to concentrate was moderately limited.  [R143, 155].  Although Dr. Herrera's treating notes do not explicitly refer to Plaintiff's problems with concentration, there is no medical evidence that contradicts Dr. Herrera's finding.  Instead, Dr. Prince supports Dr. Herrera's opinion that Plaintiff had a symptom of lack of concentration.

45

Third, evidence shows that Plaintiff experienced sleep disturbance. Certainly, the record indicates that Plaintiff was sleeping well and sleeping well with medications, [R245-46, 265, 270-71, 274, 331-32, 335-38, 340-44], but interspersed with the notes that Plaintiff was sleeping well were notes that Plaintiff was sleeping irregularly, [R247, 249-51, 263, 266, 268, 333, 339]. Based on the varied reports concerning Plaintiff's ability to sleep, it does not appear that substantial evidence supports the ALJ's implicit finding that the medical evidence contradicts this symptom. Without an explanation by the ALJ regarding this varied evidence concerning Plaintiff's sleep, the Court cannot definitively make a determination as to whether substantial evidence supports the ALJ's finding.

Fourth, the Court finds that substantial evidence appears to support the ALJ's conclusion that Plaintiff did not have symptoms of psychomotor agitation or retardation. The Court is unaware of and Plaintiff has not identified any evidence in Dr. Herrera's treatment notes or elsewhere indicating that Plaintiff had psychomotor problems such as fidgeting, hand wringing, or racing thoughts. Thus, substantial

46

evidence appears to support the ALJ's conclusion that the symptom of psychomotor agitation is not supported by substantial evidence.[17]

Finally, the Court finds that substantial evidence supports the ALJ's finding that Dr. Herrera's opinion that Plaintiff suffered from feelings of guilt or worthlessness was not supported by the medical record.  The Court's review of the entire medical record uncovered no evidence substantiating that Plaintiff had symptoms of feeling guilty or worthless.  Without any notations in the record, the Court can only conclude that this lack of evidence constitutes substantial evidence supporting the ALJ's finding.

––––––––––––––––––

[17]     The Court notes that the following evidence might indicate, however, that Plaintiff had psychomotor agitation because she: presented as hyperverbal in October 2000, [R275], was angry in November 2000, [R273], had a wide range of affect in November 2000, was anxious in February 2001, [R268], was verbally hostile and insecure in March 2001, [R266], was irritable in April 2001, was anxious at times in May 2001, [R263], was irritated and anxious in June 2001, [R261], was irritable and anxious in August 2001, [R260], had a diagnosis of panic disorder and was found to have a poorly controlled temper in December 2001, [R132; Doc. 10 at Exh.], was suffering from anxiety and feeling overwhelmed in February 2002, [R251], was verbally hostile in May 2002, [R249], demonstrated verbal hostility in September 2002, [R245], was irritable and anxious in November 2002, [R342], was anxious and feeling over stressed in December 2002, [R341], was verbally hostile in January 2003, [R340], was anxious in February and March 2003, [R338-39], was frustrated in May 2003, [R336], was frustrated in July 2003, [R334], and was anxious and verbally hostile in August 2003, [R333].  Although this evidence might substantiate Dr. Herrera's finding that Plaintiff had psychomotor agitation, it appears that the ALJ weighed the evidence as not demonstrating psychomotor problems.

47

Based on the following discussion, the Court concludes that the ALJ's analysis that Plaintiff's symptoms were not consistent with the medical record is not entirely accurate. The above discussion demonstrates the ALJ's need to provide specific evidence concerning the weight given to Dr. Herrera's opinion for the Court to evaluate the Commissioner's decision.

b.      *Social Functioning*

The Court concludes that substantial evidence supports the ALJ's determination that Dr. Herrera's opinion that Plaintiff had marked limitations in social functioning is not supported by some of his opinions concerning Plaintiff's work abilities. First, this finding appears inconsistent with Dr. Herrera's findings regarding the following work abilities related to social functioning: (1) she had very good ability to maintain personal appearance; (2) she had a good to poor ability to behave in an emotionally stable manner; (3) she had a fair to poor ability to relate predictably in social situations; and (4) she had an unlimited to good ability to demonstrate reliability. [R313]. Plaintiff's very good reliability and ability to maintain her appearance suggest that Plaintiff's social functioning was not markedly limited. It is true that Dr. Herrera's findings concerning Plaintiff's ability to behave in a stable manner and to relate predictably

48

suggest limitations in Plaintiff's social functioning, but the Court cannot say that the ALJ erred in finding that these limitations were not marked.

Second, this findings of marked difficulty in social functioning appears to be contradicted by Dr. Herrera's work-related findings that Plaintiff had a: (1) good to fair ability to relate to co-workers; (2) good to poor ability to deal with the public; and (3) good to fair ability to interact with supervisors. [R311-12]. That Plaintiff had a good ability to relate with others does not suggest marked limitations in social functioning.

The Court notes, however, that substantial evidence supports Dr. Herrera's opinion regarding Plaintiff's ability to make social adjustments. First, a constant observation in all of Dr. Herrera's treatment notes is that Plaintiff was clean and properly dressed. Thus, this opinion is clearly supported by the evidence. Second, the records demonstrate that Plaintiff was able to consistently and regularly attend her substance abuse meetings and keep her medical and counseling appointments from 2000 until early 2004. Thus, Dr. Herrera's opinion that Plaintiff had an unlimited to good ability to be reliable is supported by the medical record.

Third, the medical evidence appears to support Dr. Herrera's opinion that Plaintiff had a good to poor ability to behave in an emotionally stable manner.

49

Dr. Herrera's treatment notes demonstrate swings in Plaintiff's emotional stability. On some visits, Plaintiff was stable and exhibited good impulse control. [*See* R248, 250, 263, 265, 270, 335, 337, 341-42]. On other visits, however, Plaintiff: showed sadness at times at November 2000 and February 2001 appointments, [R271, 269]; reported crying spells and was sad and anxious in August 2001, [R260]; felt overwhelmed and had audiovisual hallucinations in February 2002, [R251]; was verbally hostile at times in May 2002, [R249]; had a swinging mood in September 2002, [R245]; was irritable and preferred to be by herself in November 2002, [R342]; exhibited psychotic symptoms and was over stressed, sad, and anxious in December 2002, [R341]; was sad and verbally hostile in January 2003, [R340]; had an anxious, sad, and fearful mood in February 2003, [R339]; had periods of hostility in March 2003, [R338]; had an up and down mood in April 2003, [R337]; had a sad, confused, and frustrated mood in July 2003, [R334]; and was anxious, sad, and fearful with crying spells in August 2003, [R333]. Dr. Prince indicated that Plaintiff's appearance was questionable due to her being intermittently teary and to her showing a fearful and depressed mood. [Doc. 10 at Attach.]. All of this evidence supports the conclusion concerning Dr. Herrera's apparent opinion regarding Plaintiff's emotional stability to range from good to bad.

50

Finally, the Court notes that substantial evidence supports Dr. Herrera's opinion that Plaintiff had a fair to poor ability to relate in social situations. Again, the Court notes Plaintiff's crying spells during her medical appointments and counseling sessions. [R189, 260, 333; Doc. 10 at Attach.]. Also, Plaintiff exhibited verbal hostility on occasions. [R245, 249, 266, 333, 338, 340]. Treatment notes also indicated that Plaintiff was irritable. [R260-61, 265, 342]. The Court is unaware of what evidence the ALJ found to contradict this opinion because the ALJ never specifically identified any contradictory evidence.

Although Dr. Herrera's opinion regarding Plaintiff's marked limitations in social functioning may not be supported by evidence, Dr. Herrera's opinion concerning work abilities relating to social functioning is supported by evidence. As a result, the above discussion provides a complicated picture regarding Dr. Herrera's opinion. The ALJ's one sentence analysis does not sufficiently address this complicated picture. As a result, the Commissioner must provide more information about why Dr. Herrera's opinion concerning Plaintiff's social functioning was not entitled to great weight.

     *c.*  *Concentration, Persistence, or Pace*

The Court concludes that the ALJ's determination to not give controlling weight to Dr. Herrera's opinion about Plaintiff's ability to concentrate is unsupported by

substantial evidence.  Dr. Herrera found that Plaintiff had fair to poor ability to maintain attention and concentration[18] and marked deficiencies in concentration, persistence, or pace.  [R309, 312].  Dr. Herrera's treatment notes do not explicitly discuss Plaintiff's ability to concentrate.  Dr. Prince, an examining doctor, provided an opinion that supports Dr. Herrera's in that he reported Plaintiff's difficulty maintaining concentration and in her "grave difficulty" in completing tasks in a dependable manner. [*See* Doc. 10 at Exh.].  The Court recognizes that the opinions of Dr. Unger and Dr. Hollender, consulting doctors, found Plaintiff to be moderately limited in maintaining attention, concentration, persistence, or pace for extended periods of time. [R143, 147, 162, 166].  The ALJ cannot use these opinions as substantial evidence to reject the medical opinion of Dr. Herrera, the treating doctor.  *See Lewis*, 125 F.3d at 1440.  The Court is unaware of any other evidence that contradicts Dr. Herrera's finding of marked difficulties regarding concentration and attention.  As a result, the Court finds no substantial evidence in the medical record to support the ALJ's decision not to give Dr. Herrera's opinion controlling weight based on inconsistencies in the medical record.

_____

[18]     Dr. Herrera used fair to mean that Plaintiff's ability to function in this area is seriously limited.  [R311].

The Courts notes that the ALJ's conclusion regarding Dr. Herrera's opinion about Plaintiff's concentration might have some support from Dr. Herrera's work ability findings.  It appears that the ALJ could find Dr. Herrera's work-related findings that Plaintiff had a good ability to carry out complex job instructions and detailed but not complex instructions, [R312], inconsistent with the finding of marked difficulty to maintain concentration, persistence, or pace in completing tasks in a timely manner. The Court notes, however, that Dr. Herrera also determined that Plaintiff's work-related activity of maintaining attention and concentration was fair to poor, [R312], which supports his marked difficulty finding.  The ALJ did not explain how she dealt with this inconsistency despite her need to discuss all evidence supporting and contradicting her findings.   Without the ALJ explaining why she resolved this conflict in the Commissioner's favor, the Court will not attempt to give an explanation.

The above discussion demonstrates that the weight given to Dr. Herrera's opinion needed a more detailed analysis for the Court to determine if this determination was supported by substantial evidence.  A one sentence analysis is not sufficient given the complicated interplay between the evidence and Dr. Herrera's opinion.  As a result, the Court concludes that the ALJ's analysis in discrediting Dr. Herrera's treating opinion is insufficient given the requirement that the ALJ list specific reasons and cite

to medical evidence.  *See Morrison v. Barnhart*, 278 F. Supp. 2d 1331, 1336 (M.D. Fla.

2003) (concluding that ALJ's finding that treating opinion "is not consistent with the

evidence of record as a whole, including the doctor's own examination findings," was

too general to permit meaningful judicial review); *cf. Phillips*, 357 F.3d at 1241

(affirming ALJ's disregard of treating physician's opinion where the ALJ "articulated

several reasons for giving less weight" all of which were supported by substantial

evidence).   This Court cannot merely rubber stamp the Commissioner's disability

determination, but instead must be able to evaluate the Commissioner's decision.  *See*

*Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (indicating that courts must do

more than rubber stamp the ALJ's decision).

      2.     *The Appropriate Remedy*

Plaintiff contends that by accepting Dr. Herrera's opinion as true, the Court must

award benefits either at step 3 of the sequential evaluation process by finding that

Plaintiff meets Listing 12.04 or at step 5 by finding that Plaintiff is disabled based on

her limitations and the VE testimony.  [Doc. 10 at 17-18].  The Court concludes that the

case should be remanded for the Commissioner to explain in greater detail the reasons

for not giving Dr. Herrera's opinion great weight.[19]   As the ALJ's conclusory evaluation of Dr. Herrera's opinion currently stands, the Court has no means of determining whether the ALJ properly evaluated this opinion.

a.   Listing 12.04

An individual meets Listing 12.04 when the following two conditions are met. First, there must be a medically documented continuous or intermittent persistence of major depressive syndrome characterized by at least four of the following: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with weight change; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; or (9) hallucinations, delusions, or paranoid thinking.  Second, this depressive syndrome must then have resulted in at least

------

[19]   The Court notes that Dr. Herrera's opinion that Plaintiff is disabled is of no assistance to this Court because this opinion does not constitute a medical opinion under the regulations.  A medical opinion concerns the nature and severity of an impairment.  *See* 20 C.F.R. § 416.927(a)(2).  A finding of disability does not fall within the definition of medical opinion.  Furthermore, this finding is explicitly the province of the Commissioner.  *See Id.* § 416.927(e)(1), (3); *see also Miller v. Barnhart*, 182 Fed. Appx. 959, 964 (11th Cir. May 31, 2006) (noting that treating physicians' opinions concerning disability are not binding on the ALJ).  As a result, the Court finds that it cannot award benefits merely because Dr. Herrera believed that Plaintiff was disabled.

55

two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.04A, B.

        As discussed above, the ALJ's analysis concerning the weight given to Dr. Herrera's opinion is flawed.  The Court finds that it is premature to award benefits because, for the reasons discussed above, the medical evidence did not necessarily demonstrate that Plaintiff had: (1) marked difficulties in maintaining social functioning; or (2) symptoms of psychomotor agitation or retardation or feelings of guilt or worthlessness.  As a result, the Court concludes that it is inappropriate to find Plaintiff disabled at step 3 based on Dr. Herrera's opinion.

### b.        Functional Limitations

        The Court also finds that it cannot make a disability finding based on Dr. Herrera's opinion concerning Plaintiff's functional limitations.  Dr. Herrera provided an opinion about Plaintiff's functional limitations by drawing circles in a grid that listed job-related characteristics and the level of Plaintiff's limitations.  However some of these circles encompassed a wide range of limitations for the same activity. For instance, Dr. Herrera's opinion appears to be that Plaintiff had a good, fair, and

poor ability to deal with work stress, to deal with the public, and to behave in an emotionally stable manner.  [*See* R311-13].[20]  The Court is unsure how to decipher Dr. Herrera's decision to circle a range of limitations for one work-related activity because nothing in the record clarifies what the circles mean.  Also, the VE's testimony does not help the Court determine whether Plaintiff is disabled based on Dr. Herrera's limitations.  The VE testified that an individual with the following characteristics would not be able to perform any work within the national economy: (1) a seriously limited ability to (a) deal with the public, (b) use good judgment, (c) interact with supervisors, (d) deal with work stress, function independently, and (e) behave in an emotionally stable manner; and (2) no useful ability to (a) maintain attention and concentration, and (b) relate predictably in social situations.  [*See* R372].  Although the limitations found

---

[20]      Dr. Herrera's entire medical opinion concerning the limitations stemming from Plaintiff's mental abilities is as follows: (1) a more than satisfactory, *i.e.*, very good, ability to (a) understand and carry out simple job instructions, and (b) maintain personal appearance; (2) a very good to good ability to demonstrate reliability; (3) a satisfactory, *i.e.*, good, ability to (a) follow rules, and (b) understand and carry out complex job instructions and detailed, but not complex, instructions.; (4) a satisfactory to seriously limited, *i.e.*, good to fair, ability to (a) relate to co-workers, (b) use judgment, (c) interact with supervisors, and (d) function independently; (5) a satisfactory to no, *i.e.*, good to poor, ability to (a) deal with the public, (b) deal with work stress, and (c) behave in an emotionally stable manner; and (6) a seriously limited to no, *i.e.*, fair to poor, ability to (a) maintain attention and concentration, and (b) relate predictably in social situations.  [R311-13].

AO 72A
(Rev.8/8
2)

in Dr. Herrera's opinion appear to be close to those that the VE found to be disabling, the VE's testimony does not speak of whether an individual has the ability to work when his abilities to deal with work stress and the public and behave in an emotionally stable manner ranged from good to poor.  The Court does not know how to reconcile the discrepancy in the VE testimony with that of Dr. Herrera's opinion.  As a result, the Court does not have sufficient evidence to determine whether Plaintiff is disabled even if Dr. Herrera's opinion concerning Plaintiff's functional limitations are accepted as true.[21]

The Court therefore will not remand for an award of benefits and instead finds that the case should be remanded for further proceedings.  *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987) (remanding case for Commissioner to properly consider treating doctors' opinions where record as a whole did not conclusively contradict doctor's opinions); *Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1220 (11th Cir. 2001) (remanding for ALJ to consider and accord proper weight to the opinion of treating doctors); *Mills v. Astrue*, No. 06-12813, 2007 WL 979925, at *6

_____

[21]    The VE provided testimony about specific limitations for specific job-related characteristics.  On remand, the Commissioner should recontact Dr. Herrera to have him state clearly what limitations Plaintiff has.  Based on this opinion, the Commissioner shall then determine whether Plaintiff is disabled.

58

(11th Cir. Apr. 3, 2007) (reversing and remanding for ALJ to clearly articulate reasons for not giving treating doctor's opinion substantial weight when ALJ merely stated that the doctor's findings were "excessive" and "not supported by evidence in the record"); *cf. Burroughs v. Massanari*, 56 F. Supp. 2d 1350, 1367 (N.D. Ga. 2001) (awarding benefits where the VE's testimony established that if the treating physician's opinion was treated as true, the claimant would be unable to perform any work).

> B.      Residual Functional Capacity ("RFC")

Plaintiff argues that the ALJ's RFC assessment was erroneous because the ALJ did not consider all of Plaintiff's impairments, both severe and non-severe, in making the RFC determination.  [Doc. 10 at 19-21].  Plaintiff notes, for instance, that because the ALJ found that Plaintiff's asthma and bronchitis were severe impairments, the ALJ should have considered the functional limitations from these impairments in evaluating the RFC.  [*Id.* at 20].  The Commissioner responds that the ALJ properly found no limitations from Plaintiff's asthma, hypertension, and reflux disease because there was no medical evidence of limitations, Plaintiff worked a prior job with these impairments, and Plaintiff did not complain at her hearing about these impairments.  [Doc. 14 at 10-11].

59

The RFC "assessment is made prior to, and used in, steps four and five of the five-part evaluation under 20 C.F.R. § 404.1520." *Tauber*, 438 F. Supp. 2d at 1374. The RFC is the most sustained work activity that a claimant can perform in an ordinary work setting on a regular and continuing basis despite his physical and mental limitations. 20 C.F.R. § 404.1545(a); SSR 96-8p. To evaluate the RFC, the ALJ must consider all of Plaintiff's impairments in combination. *See Jones v. Bowen*, 810 F.2d 1001, 1006 (11th Cir. 1986); *see also* 20 C.F.R. § 416.945(a)(2) (indicating that the ALJ "will consider all of [claimant's] medically determinable impairments of which [the ALJ is] aware, including [the claimant's] medically determinable impairments that are not 'severe'"); SSR 96-8p (indicating that the RFC is based on "all of the relevant evidence in the case record"). In making the RFC assessment, the ALJ must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p. The RFC involves both exertional and nonexertional limitations.[22] *Id.*

---

[22]     "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." In contrast, "[n]onexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength . . . . It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative

60

The Court concludes that the ALJ did not properly consider the combination of all impairments in determining Plaintiff's RFC.  First, the Court is unaware of any statement by the ALJ that she considered all impairments in combination when formulating the RFC.  In the absence of such a statement, the Court is persuaded by Plaintiff's argument concerning the ALJ's finding that Plaintiff's bronchitis, asthma, and hypertension were severe impairments.  [*See* R17].  When the ALJ found these impairments severe, she found that these conditions significantly limited Plaintiff's physical or mental ability to perform basic work activities.[23]  *See* 20 C.F.R. §§ 416.920(c), 416.921(a).  The ALJ indicated that Plaintiff did not have any exertional limitations for the RFC without explaining her reasons or citing to any evidence. [*See* R18].  In light of the ALJ's finding that Plaintiff's bronchitis, asthma, and hypertension were severe, the ALJ needed to explain why these impairments, which by

---

(hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision)."  Also, the nonexertional capacity considers "the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes)."  SSR 96-8p.

[23]     Basic work activities are the abilities and aptitudes necessary to do most jobs like: performing physical functions such as standing and walking; being able to see, hear, or speak; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and normal work situations; and dealing with changes in the routine work setting.  20 C.F.R. § 416.921(b)(1)-(6).

61

virtue of being severe limited Plaintiff's mental or physical ability to perform basic work activities, did not cause any exertional limitations. *See* 96-8p. Without such an explanation, the Court has no way of determining whether the ALJ considered all of Plaintiff's impairments in evaluating Plaintiff's RFC.

The Commissioner argues that there was no error because there was no medical evidence that Plaintiff's asthma, hypertension, and reflux disease caused limitations, Plaintiff worked a prior job with these impairments, and Plaintiff did not complain at her hearing about these impairments. There may be some merit to these arguments insofar as they might show harmless error because the Court is unaware of any evidence of exertional limitations concerning any of Plaintiff's impairments and Plaintiff did not complain about the impairments at her administrative hearing. *See* SSR 96-8p ("[W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record [of] . . . such a limitation or restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity.") However, in light of the need to remand this case following the erroneous consideration of Dr. Herrera's opinion, the Court finds that the ALJ should explicitly consider all impairments in making the RFC determination in accordance with SSR 96-8p. *Cf. Morrison*,

278 F. Supp. 2d at 1336 ("[W]ithout reaching the merits of this claim and in light of plaintiff's case being remanded on the above ground, the ALJ is directed to address the potential problems related to this contention and to specifically indicate whether he considered all her impairments singularly and in combination.").

## VII.   CONCLUSION

Pursuant to this Court's power to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405 (g),[24] the Court hereby **REVERSES AND REMANDS** this case for the Commissioner (1) to evaluate Plaintiff's RFC by considering all of Plaintiff's impairments and (2) to explain the weight given to Dr. Herrera's opinion with sufficient specificity.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

---

[24]     "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

AO 72A
(Rev.8/8
2)

**IT IS SO ORDERED AND DIRECTED** this the 1st day of May, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

64